UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHANE CRAFT,

                Petitioner,

                                    **DECISION AND ORDER**

    -vs-                             **No.10-CV-6049(MAT)**

ROBERT A. KIRKPATRICK,

                Respondent.

_____

## I.   Introduction

Petitioner <u>pro</u> <u>se</u> Shane Craft ("Craft" or "Petitioner"), currently incarcerated for his conviction for first degree gang assault, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Also pending before the Court is Craft's motion to stay the petition in order to return to state court to exhaust claims of ineffective appellate and trial counsel. For the reasons that follow, the petition is dismissed and the motion to stay is denied with prejudice.

## II.  Factual Background

Petitioner and his codefendants (James Reed ("Reed"), Paul Dawson ("Dawson"), Charles Magaddino ("Magaddino"), David Kennerkneckt ("Kennerkneckt")) were charged with depraved indifference murder and gang assault in connection with the death of Nicholas Kwasniewski ("Kwasniewski" or "the victim") in the City of Niagara Falls on June 4, 2005.  Reed, Dawson, and Magaddino

elected to plead guilty and cooperated with the district attorney's office with regard to Petitioner's prosecution. The trial court dismissed the depraved indifference murder count against Petitioner before his trial began.

The prosecution argued that the Krasniewski murder was done in retaliation for injuries Craft sustained in March 2005, during a drug-deal. While Petitioner was consummating a marijuana sale to four men, his skull was fractured when struck with a metal pipe and he was robbed of a gold chain. One of the four alleged assailants was Nick Payne ("Payne"), a former friend of Petitioner's. The incident was reported to the police, who concluded that the robbery was a drug-deal gone bad; no arrests were made.

About two months later, Petitioner was interviewed by a victim's assistance advocate. Upset about the lack of any arrests, Petitioner stated that if something was not done soon he would take matters into his own hands. Petitioner repeated his threats of retaliation against Payne to one of his teachers and his guidance counselor. When his teacher asked Petitioner not to do anything, he replied that he would not have to do it, and that he had friends who would take care of it for him. This conversation occurred on June 2nd, two days before the victim was killed.

On June 4, 2005, Petitioner's friend Amanda Fero ("Fero") thought she saw Payne at a gray house about a block and a half from

her own house. Fero called Petitioner and told him that she had just seen Payne.

Petitioner and Kennerknecht traveled in Petitioner's Cadillac to Reed's house. Dawson and Magaddino were also there. Petitioner told the group that Fero had called and told him where Payne was living. Petitioner also told the group that "he wanted [them] to go with him so he could – he could fuck Nick up."

The five men then traveled in Petitioner's Cadillac and drove to Fero's house. On the way, everyone but Dawson took their shirt off, leaving their white T-shirt on. According to Magaddino, "whenever somebody gets in a fight or plans on fighting, it's habit – habit to take off your overshirt so you don't ruin it."

They all walked several blocks down 19th Street to where Fero had last seen Payne. During the walk, there was conversation to the effect that the four codefendants were going to "watch [Petitioner's] back."

Reed and Magaddino stopped in front of the house and the rest of the group walked past three more houses. Magaddino screamed out, "Nick!" A man later identified as Kwasniewski came out, walked off the porch onto a concrete sidewalk that led to the front sidewalk, and talked with Magaddino. The victim asked Magaddino if he had lost his dog. Magaddino told him no, but he would like to talk to him. The victim said sure and walked off the porch and down the sidewalk towards the fence that bordered the street sidewalk and

the front yard of the house. The victim was about 5 to 10 feet away from the fence when Petitioner put his right hand on the fence and jumped over.

After Petitioner jumped the fence, he said, "[C]lose enough or this will do, something along them [sic] lines." The victim said, "[Y]ou don't know me or I don't know you, something like that". After that exchange, Petitioner punched the victim several times in the face. The victim stumbled back after the blows and threw no punches.

After Petitioner threw the first several punches, Magaddino opened the gate, entered the yard and began punching the victim. Magaddino testified that he threw the punches because he "took that to be the person that hit [Petitioner] with a lead pipe." When Magaddino started to hit the victim, Magaddino was to the side of the victim and Petitioner was in front of the victim. Reed and Kennerkneckt also entered the yard and began hitting and punching the victim. Having thrown the first two punches, Petitioner stepped back and stood either on one side of the gate or the other. The victim slumped to the ground with his back to the fence and Magaddino and Reed kicked him.

Dawson then yelled "let's go" and everybody ran out of the yard and back to Petitioner's Cadillac. Petitioner did not drive because "he didn't want to be seen."

During the drive to Reed's house, Petitioner was "gloating" about what happened and was "saying stuff like 'we got him.'" Dawson asked Petitioner if the victim was one of the guys who had jumped him and Petitioner said no. When Dawson asked Petitioner why he had just attacked Krasniewski, Petitioner replied that the victim "obviously" knew Payne and deserved everything he got. When Dawson asked Petitioner what would happen if the person was really hurt, Petitioner replied "no one cared when they beat me in the head with a lead pipe so why would they care about this."

At Reed's house, Petitioner was complaining that he had cut his hand when he jumped the fence. His friends suggested that he go to the hospital to get stitches, but Petitioner just wrapped his hand in a gauze bandage. Petitioner admitted to Matthew Fickes, who was present at Reed's house, that he had hopped the fence, cut his hand, and hit the victim two or three times.

DNA evidence established that Petitioner's blood was at the crime scene. The medical examiner testified that the victim's death was caused by blunt force trauma with ten separate areas of head injury.

The jury returned a verdict convicting Petitioner of first degree gang assault. He was sentenced to the maximum term of 25 years to life in prison.

## III. Discussion

### A.   Legal Insufficiency of the Evidence

Petitioner argues there was insufficient evidence to convict him of first degree gang assault because his codefendants' testimony allegedly was coerced and uncorroborated, and failed to state that Petitioner actually participated in the gang assault.

When reviewing a state court conviction on these grounds, a federal habeas court considers "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Where, as here, a challenge to the sufficiency of the evidence is based upon a witness's alleged lack of credibility, the petitioner's burden becomes insurmountable because section 2254 "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434 (1983). The weight given to a witness's testimony is a question of fact to be determined by the jury, Mason v. Brathwaite, 432 U.S. 98, 116 (1977), and a district court sitting in habeas review must resolve all credibility issues in the verdict's favor and cannot second-guess the jury's determinations. United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993).

-6-

In any event, there is ample testimony in the record corroborating his accomplices' version of the murder: three witnesses testified that Petitioner sought a confrontation with the victim; he was wounded when he returned to his house after the murder; and his blood was found at the crime scene.

Petitioner also contends that his conviction was based on a misinterpretation of his statement to his teacher that "if I can't do it my friends will" and thus was not supported by legally sufficient evidence. It is jury's exclusive responsibility to determine ultimate questions of fact, including the meaning to be ascribed to this statement. E.g., United States v. Gaudin, 515 U.S. 506, 509-510 (1995); People v. Grutz, 212 N.Y. 72, 82, 105 N.E. 843, 847 (N.Y. 1914).

To the extent that Petitioner challenges the sufficiency of the evidence generally, the Court finds this request for habeas corpus relief equally unavailing. Under New York State law, "[a] person commits first degree gang assault when, with the intent to cause serious physical injury to another person and when aided by two or more other persons actually present, he causes serious physical injury to such person or to a third person." N.Y. Penal Law § 120.07.  When viewing the trial proof, summarized above in Section II of this Decision and Order, in the light most favorable to the prosecution in this case, a rational trier of fact easily

could have found that Petitioner committed essential elements of first degree gang assault beyond a reasonable doubt.

## B. Erroneous Admission of Petitioner's Statements to the Police

The Appellate Division held that the trial court properly refused to suppress statements that Petitioner made to the police, since the evidence presented at suppression hearing established that the police lawfully stopped defendant's vehicle and that defendant's statements made to the police at that time were not in response to custodial interrogation. People v. Craft, 57 A.D.3d at 1389 (citations omitted). Rather, the statements were made in response to inquiry necessary to provide for defendant's physical condition and needs. Id. (citation omitted). Finally, the hearing testimony established that Craft's subsequent statements were made after defendant had waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Id. (citation omitted). These rulings were correct applications of Federal law.

### 1. Statement Obtained During the Stop of Petitioner's Vehicle

Petitioner's argument that his statements were inadmissible because they were based on an illegal stop is precluded under Stone v. Powell, 428 U.S. 465, 481-82 (1976)(federal habeas courts cannot consider a claim that evidence obtained in violation of the Fourth Amendment should have been excluded at trial when the prisoner has had an opportunity for full and fair litigation of that claim in

-8-

the state courts) and <u>Cardwell v. Taylor</u>, 461 U.S. 571, 572-73 (1983)(applying the <u>Stone v. Powell</u> doctrine to seizures).

Also, Petitioner's argument that his statement to the police officer who stopped his vehicle was admitted into evidence in violation of <u>Miranda</u> is without merit because Petitioner was not in custody at that time. The Supreme Court has identified two "discrete inquiries [which] are essential to the determination" of whether a defendant has been taken into custody for <u>Miranda</u> purposes. <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995). First, the court must look at the objective circumstances surrounding the interrogation. Second, the court must determine whether, in light of those circumstances, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." <u>Id.</u> at 113 (footnote omitted). If a "reasonable person" would not have felt free to leave, then the reviewing court must proceed to the second step of the custody analysis and determine whether this "reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." <u>Id.</u> "Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply of protections prescribed by <u>Miranda</u>.'" <u>Id.</u>

The police stopped Petitioner's gray Cadillac on 19th Street the day after the crime based upon information that a gray Cadillac had been seen at a recent homicide on 19th Street and that the

-9-

plates may have been switched. A computer inquiry revealed that the plates on Petitioner's Cadillac should have been on a 1990 Mercury. Switched plates is a violation of Vehicle and Traffic Law § 402-1, and provided the police with reasonable suspicion to stop Petitioner's Cadillac. Although the police officer learned, after he stopped the car, that it had been issued a temporary registration and the plates were correct, that did not vitiate his initial authority to stop the vehicle. As part of the frisking procedure, the police officer asked Petitioner to put his hands behind his head. At that point the officer observed a large gauze bandage on his right hand and asked him what was wrong with his hand. Petitioner replied that he had cut his hand on speaker wire at about 1 p.m. the prior day.

The state courts correctly ruled that the question and answer concerning Petitioner's injured hand was admissible because they were not the product of custodial interrogation. As the suppression court correctly pointed out, under New York and Federal law, even questioning following a frisk, in the absence of other factors equivalent to a formal arrest, does not constitute custodial interrogation. People v. Morales, 65 N.Y.2d 997, 998 (N.Y. 1985) (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984); United States v. Bautista, 684 F.2d 1286, 1291 (2d Cir. 1982)). In this case, there were no other factors equivalent to a formal arrest: The police had not drawn their weapons and Petitioner was not

handcuffed. Because Petitioner was not in custody, no <u>Miranda</u> warnings were required prior to the officer's question about the wound.

### 2.    Statement to the Police Officer During Booking

The police officer who had stopped Petitioner's car arrested him for illegally possessing brass knuckles. At the police station, another officer observed Petitioner's hand injury while photographing him in the booking area. (As part of the booking procedure, the police were required to take photographs of any injuries Petitioner had at the time.) The officer remarked that it was a pretty bad cut. Petitioner replied that he had gotten it while installing speaker wire in his car.

At that point, Petitioner was in custody. In <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980), the Supreme Court held that custodial interrogation requiring the issuance of the <u>Miranda</u> warnings occurs whenever an individual is "subjected to either express questioning or its functional equivalent." <u>Id.</u> at 300-01. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301. Here, the officer's comment about Petitioner's injury was not "reasonably likely to elicit an incriminating response[,]" <u>id.</u> Moreover, because Petitioner had already made the same statement to

the officer who frisked him, the statement made in response to the second officer was cumulative. Thus, any error would have been harmless.

## C.   Failure to Disclose Evidence Favorable to the Defense

A criminal defendant's due process rights encompass the obligation of the prosecution to produce evidence that is "material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87 (1963). Evidence is considered material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). Mere speculation that exculpatory evidence was withheld is insufficient to establish a viable Brady claim. E.g., Strickler v. Greene, 527 U.S. 263, 286 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review.").

### 1.   Tape-Recording of a 911 Call

Petitioner contends that the prosecution failed to disclose a tape of a 911 call that allegedly was favorable to the defense. In his petition, he did not provide any further details.

In one of his later filings, Petitioner submitted a transcript of the tape, which includes numerous other calls made around the time of the assault. Petitioner has not explained how it was favorable to the defense.  The Court has reviewed the transcript in

its entirety in an attempt to discern this. One of the witnesses who communicated with the 911 operator said that there were six white males who were involved, but only three of them actually attacked the victim. This is the only portion of the report that could potentially be construed as favorable to the defense. However, there were no descriptions given regarding the assailants, and Petitioner could not be excluded as one the individuals who this witness saw beating the victim.

A Brady violation occurs only where the evidence suppressed " 'could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict.' " United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995) (footnote omitted)). Even assuming that this report had some exculpatory value, it was not "material" for Brady purposes because it could reasonably have been taken "to put the whole case in such a different light as to undermine confidence in the verdict[,]" Kyles, 514 U.S. at 435. In other words, "disclosure of the suppressed evidence to competent counsel would [not] have made a different result reasonably probable[,]" id. at 441; see also Bagley, 473 U.S. at 682 ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").

### 2.    Autopsy Report of the Victim

Petitioner alleges that the prosecution failed to turn over the autopsy report of the victim. This contention is not supported by the record. Moreover, Petitioner has not demonstrated how the report was favorable to the defense.

### 3.    Photographs of the Crime Scene

Petitioner states that the prosecution failed to disclose favorable crime scene photographs. This argument has never been raised before and is not exhausted. Furthermore, Petitioner has not identified which photographs alleged were not disclosed; nor has he explained how they would have aided the defense.

### D.    Ineffective Assistance of Trial Counsel

To show ineffective assistance of counsel, a petitioner must satisfy both prongs of the two-part test articulated in Strickland v. Washington, 466 U.S. 668, 687-96 (1984). Petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness;" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [sentencing] proceeding would have been different." Strickland, 466 U.S. at 688; see also id. at 694.

### 1.    Failure to Argue that Petitioner Should Be Accorded Youthful Offender Status

Petitioner contends that trial counsel was ineffective for failing to request that he be afforded youthful offender ("YO") status at sentencing. The presentence report indicated that

Petitioner was eligible for YO status. As a result, the sentencing court was aware of the issue. Although it may have been better practice for defense counsel to have advanced this argument, Petitioner has failed to demonstrate how any statements by his attorney on this point would have resulted in a different outcome.

### 2.   Failure to Argue that the Gang Assault Offense Merged with the Murder Charge

Petitioner argues that trial counsel was ineffective in failing to argue that the count charging him with gang assault merged with the count charging him with depraved indifference murder. The point is moot, however, since the trial court dismissed the depraved indifference murder charge prior to opening statements.

### 3.   Failure to Properly Advise Petitioner Regarding the Right to Testify

The ultimate decision regarding whether to testify belongs to the defendant, and his attorney's professional duty is to advise him of the benefits and pitfalls of the decision. Brown v. Artuz, 124 F.3d 73, 78 (2d Cir. 1997). According to Petitioner, he did not testify because trial counsel said that did not have to because the burden was on the prosecution to prove his guilt to the jury. However, trial counsel's statement was not incorrect. More important, Petitioner has wholly failed to demonstrate how his testimony would have resulted in a more favorable outcome. Thus, he cannot show how he was prejudiced by counsel's performance.

-15-

### 4.    Failure to Challenge a Juror

Petitioner claims that trial counsel was ineffective in failing to move to excuse a juror who was arrested for driving while intoxicated during the trial.

As a general matter, a defendant who seeks a new trial based on allegations of juror misconduct faces a very high hurdle. As the Supreme Court explained, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." Tanner v. United States, 483 U.S. 107, 120-21(1987). Accordingly, "courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983).

Even where a juror, during voir dire, has failed to disclose prior arrests, appellate courts have not reversed on the basis of juror misconduct. E.g., United States v. Langford, 990 F.2d 65 (2d Cir. 1993). In that case, the defendant learned after a guilty verdict had been returned that a juror had deliberately concealed several arrests and criminal convictions. However, the district court found no evidence that the juror lied from a desire to sit on the jury, or from some prejudice against the defendant-rather, she

had simply wished to avoid embarrassment and the possible public exposure of her criminal history. The Second Circuit affirmed the district court's denial of the defendant's motion. See id. at 69-70.

Here, inasmuch as the juror had not been convicted, he was not subject to a challenge for cause upon the basis that he was unqualified to serve pursuant to N.Y. Judiciary Law § 510(3), which provides that in order to qualify as a juror a person must, inter alia, not have been convicted of a felony. Furthermore, Craft has not demonstrated that the juror was subject to a challenge for cause under N.Y. Crim. Proc. Law § 270.20(1)(b), which requires showing that the juror had "state of mind . . . likely to preclude him from rendering an impartial verdict based upon the evidence adduced at the trial."

Petitioner has not demonstrated a meritorious basis for challenging the juror, or that the juror's presence on the jury prejudiced his right to a fair trial.

### 5.   Failure to Challenge the Verdict as Being Against the Weight of the Evidence

A "weight of the evidence" argument is a pure State law claim grounded in New York Criminal Procedure Law § 470.15(1) and (5). "Upon an appeal to an intermediate appellate court from a judgment, sentence or order of a criminal court, such intermediate appellate court may consider and determine any . . . issue of fact involving error or defect in the criminal court proceedings which may have

-17-

adversely affected the appellant." N.Y. Crim. Proc. Law § 470.15(1). A determination that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence is statutorily deemed to be a reversal or modification on the facts. Id., § 470.15(5). Thus, a challenge to the weight of the evidence is properly made by appellate counsel to the intermediate appellate court, not by trial counsel to the trial court.

### 6.    Failure to Object to a Witness' Testimony

Petitioner next contends that trial counsel was ineffective by not objecting to testimony of the girlfriend of one of the men who assaulted him in the drug-deal gone bad (the incident that led to Petitioner seeking to retaliate against "Nick"). Again, Petitioner has not supplied a colorable basis for such the objection he claims counsel should have made; nor has he demonstrated how he was prejudiced.

### F.    Constitutional Vagueness of N.Y. Penal Law § 120.07

Petitioner argues that the first degree gang assault statute is unconstitutionally vague.  The Appellate Division held that the phrase 'aided by two or more persons actually present' contained in the statute has a plain meaning that excludes constructive presence, and the statute is not vague as applied to defendant. People v. Craft, 57 A.D.3d 1388, 1389 (App. Div. 4th Dept. 2008) (citing, inter alia, People v. Hedgeman, 70 N.Y.2d 533, 538 (N.Y. 1987) (holding, in context of N.Y. Penal Law § 160.10(1), that the

term "actually present" did not encompass the presence of the getaway driver for a robbery; "[g]iving the term its natural and obvious meaning, 'actual' refers to that which is '[o]pposed to potential, possible, virtual, theoretical, hypothetical, or nominal . . . in opposition to constructive or speculative . . . in contradistinction to virtual or constructive') (internal citation and quotation omitted; ellipses in original). This was a correct application of Federal law.

The United States Constitution requires that a penal law "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983) (citations omitted). A two-part test is used to determine whether a statute is unconstitutionally vague as applied: "[T]he court must first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and then consider whether the law 'provide[s] explicit standards for those who apply [it].'" United States v. Schneiderman, 968 F.2d 1564, 1568 (2d Cir. 1992) (quotation omitted)), cert. denied, 507 U.S. 921 (1993).

Here, a person of ordinary intelligence would not have difficulty understanding the plain meaning of the statute, which makes it clear that in order to be guilty of gang assault, a person

-19-

must possess the intent to seriously physically injure someone, and to commit that injury while aided by two or more persons.  Prong one of the constitutional vagueness test is therefore satisfied.

The "mere presence" argument that Petitioner made on direct appeal to the Appellate Division also fails here because the statute clearly requires intent, aid, and actual (rather than constructive) presence.  A person of ordinary intelligence would conclude that the statute requires a person to be present and to participate during the collective assault on a victim, and it is clear that the statute does not make a person liable for just standing there or, in Petitioner's words, being "merely present." The record clearly establishes that Petitioner was not only present at the beating, but he also instigated and participated in the assault. Petitioner's level of involvement thus satisfied the required level of "actual presence" and "aiding" as described in the statute.

The second prong of the vagueness analysis requires the court to determine whether the statute provides sufficient guidance to law enforcement personnel such as police officers, prosecutors, and juries who must enforce and apply the law. Kolender, 461 U.S. at 358.  However, "some ambiguity in a statute's meaning is constitutionally tolerable." United States v. Chestaro, 197 F.3d 600, 605 (2d Cir. 1999). Courts have routinely rejected vagueness challenges to language that is not capable of precise application

but rather calls for judgment in interpreting it. E.g., Parker v. Levy, 417 U.S. 733, 752-58 (1974) ("conduct unbecoming an officer"). The discretion granted to jurors here is no greater than in other criminal statutes that have been upheld despite vagueness challenges. More is required than a "speculative danger of arbitrary enforcement," Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 503 (1982), and Craft has not made such a showing with regard to the first degree gang assault statute.

### G.   Harshness and Excessiveness of the Sentence

A habeas challenge to the sentencing judge's exercise of discretion does not present a cognizable constitutional issue if the sentence falls within the statutory range. E.g., Glover v. Burge, 652 F. Supp.2d 373, 378 (W.D.N.Y. 2009) (citing Townsend v. Burke, 334 U.S. 736, 741 (1948); White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992)). Although Petitioner received the maximum sentence allowable, it was within the applicable statutory range. His sentencing challenge does not present a question of constitutional magnitude.

## IV.   Motion to Stay

Petitioner has filed a motion to stay the petition in order to exhaust unspecified claims of ineffective assistance of trial and appellate counsel. Petitioner states that he was just recently informed by his inmate legal assistant that he was prejudiced by

counsels' performance. The Court has found no cases supporting the proposition that a petitioner's ignorance of the law constitutes "good cause" for the failure to exhaust. A lack of "good cause" is fatal to Petitioner's motion for a stay. Rhines v. Weber, 544 U.S. 269, 277-78 (2005).

**V.    Conclusion**

For the reasons stated above, Shane Craft's Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the Petition is dismissed. Craft's Motion for a Stay (Docket No. 19) is denied with prejudice. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2).  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal in forma pauperis.

**SO ORDERED.**

**S/Michael A. Telesca**

_____
                MICHAEL A. TELESCA
                United States District Judge

DATED:     July 5, 2011
           Rochester, New York

-22-